MARVIN C. GOLD ET AL. v. TOWN OF DURHAM ET AL.

SUPERIOR COURT      MIDDLESEX COUNTY      FILE NO. 10465

Memorandum filed January 5, 1950

*William Beers,* of New Haven, for the Plaintiffs.

*Richard C. Parmelee,* of Middletown, for the Defendants.

O'SULLIVAN, J.  On December 4, 1946, the plaintiffs purchased a parcel of land in Durham, located at the northwest corner of Main Street and Marina Place.  The parcel was a part of a large tract upon which stood the so-called Arrigoni homestead.  On December 19, 1946, they employed an architect, at the eventual cost to them of $43.80, to make a layout and prepare a map of a proposed gasoline station on the premises. During February of 1947, they spent $170 to cut down and remove two large maple trees which interfered with the contemplated use of the property.  On July 25, 1947, they filed with the town authorities application for the approval of the site as a gas station.  Sometime during August this application was referred to the commissioner of motor vehicles who, after a hearing thereon, issued to the plaintiffs a certificate of approval, dat-

ed September 23, 1947. In conformity with the statute, the plaintiffs paid to the commissioner the $25 fee required and also paid $6 for the newspaper advertising notice of the hearing.

In the meantime, namely, on August 4, 1947, the people of Durham had convened in a town meeting and had discussed a special act of the 1947 General Assembly (25 Spec. Laws 193, No. 158) which had become effective on May 27. This act, under a misnomer of a title, provides that the town of Durham, after approval at a town meeting, may set up zoning for a portion of the township in accordance with chapter 29 of the General Statutes (Rev. 1930). In passing, it might be noted that this chapter was repealed, effective October 1, 1947, and was superseded on that date by chapter 29 of the 1947 Supplement, which appears in the 1949 Revision as chapter 43. And it might further be added that this substitutionary legislative enactment set up a new method for the establishment of zoning in a willing township.

Reverting, now, to the town meeting held on August 4, it appears from the minutes that after much discussion a motion was approved which authorized an existing committee, known as the zoning committee, to seek further information from the owners of property on Main Street, which was the only section of the town for which zoning was contemplated. The committee was further authorized to report back to the town meeting to be held in the following October. Further detailing of the legislative activities of the town is unnecessary. Suffice it to say that on August 2, 1948, a zoning ordinance seems to have been adopted by the town.

Prior to this last mentioned date, the plaintiffs, on January 24, 1948, had given the Atlantic Refining Company an option to lease the premises, which option was exercised in April and culminated in the execution of a written lease between the parties for the term of fifteen years from the completion of a service station to be erected thereon by the plaintiffs. On February 9, 1948, the plaintiffs had hired one Isaacson to grade the property and this was done at a cost of $1350. Plans and specifications for the station were completed in April, 1948, but, due to the high cost of the proposed work as disclosed by bids, a contract was not awarded by the plaintiffs until October, 1949. The contractor, one Onofrio, then began his work but was stopped by the zoning commission. The plaintiffs were unaware of any ordinance concerning zoning until their contractor was notified

to cease operations. The plaintiffs had made arrangements for a mortgage of $17,000 to finance the construction. An application for a temporary injunction enjoining the defendant officials from interfering with Onofrio having been made to the undersigned and a citation thereon having issued, the parties appeared at New Haven and agreed that the matter might be heard on the merits as framed by the complaint and answer and that judgment thereon might be entered. This course shall be followed.

The plaintiffs make three claims of law: First, that the ordinance was not validly adopted; secondly, that they are entitled to continue with the erection of the station because of the substantial work done on the premises before the ordinance, if valid, was adopted; and thirdly, that the ordinance is invalid as to them because of its lack of a comprehensive plan and its discriminatory features.

The second claim appears to be without merit. ". . . the possession of a permit to build, commencement of work, . . . or the fact that contracts entered into with third persons may be affected, does not constitute a vested right the invasion or deprivation of which by an enactment of general application, and in a valid exercise of the police power, invalidates the latter on constitutional grounds." *Fitzgerald* v. *Merard Holding Co.,* 110 Conn. 130, 141.

Nor am I impressed with the first claim, although I make no decision with respect to it because of the view I take as to the ordinance itself.

Spot zoning is a term used in connection with both the original enactment of an ordinance and a subsequent reclassification of districts. It consists in the arbitrary devotion of small areas within a district to a use which is inconsistent with the use to which the district is restricted. *Higbee* v. *Chicago, B. & Q. R. Co.,* 235 Wis. 91, 98.

The statute (General Statutes, § 837) limits the extent and defines the purpose of a zoning ordinance. "Such regulations shall be made in accordance with a comprehensive plan" and designed to lessen congestion in the streets and to promote health and safety. "A 'comprehensive plan' means 'a general plan to control and direct the use and development of property in a municipality or a large part of it by dividing it into districts according to the present and potential use of the properties'." *Bishop* v. *Board of Zoning Appeals,* 133 Conn. 614, 618.

There is no comprehensive plan to be found in the method by which Main Street was zoned. The system followed an attempt not to zone by districts but by individual pieces of property. Every existing commercial enterprise, regardless of the Main Street frontage it was using, was placed in a commercial zone; every existing industrial enterprise was placed in an industrial zone; three properties on which residences stood were placed in a commercial zone because the owner of one stated that he planned to open a radio store and the owner of the second contemplated starting a bakery, while the third was already in the process of opening a plumbing shop. As the ordinance was enacted, Main Street had nineteen so-called districts on its east side and thirteen on its west. I have approximated the frontage of these districts over the two miles of attempted zoning as follows: Beginning at the southerly end on the east side the frontage is substantially as follows: R 600; I 200; R 50; I 150; R 600; C 100; R 2100; I 500; R 300; C 75; R 75; C 100; R 500; I 300; R 900; C 900; R 450; C 225; R 1500. And on the west side these are the substantially correct measurements: R 600; C 300; R 150; C 550; R 600; I 750; R 2000; C 50; R 3800; C 75; R 750; C 200; R 250.

To examine the map brings to mind the traditional dilemma as to whether a zebra is a white animal with black stripes or a black animal with white ones.

Regretful as it is to say so, this attempted zoning cannot be classified as the result of a comprehensive plan. On the contrary it is an unreasonable and arbitrary instance of spot zoning, and in this respect the ordinance is of no force and effect.

Accordingly, an injunction may issue restraining the defendants from interfering with the construction of a retail gasoline station upon land of the plaintiffs in the town of Durham at the northwest corner of Main Street and Marina Place. No costs shall be taxed in favor of either party.